**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SUSAN HESS HERSKOVITZ and CARL J. ROEDER, individually and on behalf of all others similarly situated,<br>*Plaintiffs,*<br>v.<br>CITY OF PHILADELPHIA,<br>*Defendant.* | Civil Action No.: _____________<br>**COMPLAINT — CLASS ACTION**<br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Susan Hess Herskovitz and Carl J. Roeder, individually and on behalf of the Class and the Corridor Subclass defined below, by their undersigned counsel, bring this Complaint against Defendant City of Philadelphia (the "City") and aver as follows:

## I. PRELIMINARY STATEMENT

1. For a person who cannot walk a block, the curb at her front door is the way home. On Pine Street and Spruce Street between Front Street and 22nd Street in Center City (the "Corridor"), the City took that curb away with one rule. Bill No. 240657, signed into law on November 13, 2024 and effective on that date, forbids anyone to stop, stand or park a vehicle within a designated bicycle lane. (Ex. A at 1–4.) It contains no disability-specific exception. It says nothing about a car, a van or a rideshare that stops to let out, or pick up, a person who cannot make it to the corner. (*Id.*)

2. The City's transportation office proposed the ban within a week of a tragedy, without weighing any alternative (¶¶ 27, 33), and the City plans to set it in concrete: it has sought grant money to add concrete and planter separation along the Corridor's 3.7 miles of bike lanes. (City's Multimodal Transportation Fund grant application ("MTF Application"), Ex. B at 1.)

3. Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act do not let a public entity run its streets that way. A city that shuts people with mobility disabilities out of a service must reasonably modify the rule that does it. Disability Rights Pennsylvania ("DRP") put the City on written notice on December 18, 2025, and, citing neighbors with mobility disabilities on the 500 block of Spruce Street, among others, requested a reasonable accommodation. (Ex. C at 1, 3.) On information and belief, the ban still carries no disability-specific exception.

4. The wrong is the same for every resident who cannot walk a block to get home and whose curb is subject to the ban, so the cure must be the same for all of them. The ban reaches every designated bicycle lane in the City; the Corridor is where its effect is most fully documented, not where it ends. The same rule strands relatives, friends and guests with mobility disabilities who come to those homes. Each resident faces one rule and one missing exception, and one order can fix it. That is why Ms. Herskovitz and Mr. Roeder sue for a citywide class, with a subclass of Corridor residents, under Federal Rule of Civil Procedure 23(b)(2), and why they seek no damages.

5. Plaintiffs accept the City's goal of safer streets, and there are many ways to pursue it without shutting people with mobility disabilities out of their homes. They simply ask that the ban contain a brief stopping exception for vehicles carrying a person with a mobility disability, an individualized process for residential disability parking and loading, and a documented accessibility evaluation of the Corridor. They seek declaratory and injunctive relief for themselves, the Class and the Corridor Subclass under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a), together with attorneys' fees and costs.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs' claims arise under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

7. This Court may declare the rights of the parties and grant further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because the City resides in this District and the events and omissions giving rise to Plaintiffs' claims occurred, and the property that is the subject of this action is situated, in Philadelphia.

9. This action asserts only claims arising under federal law. It seeks no ruling on any question of Pennsylvania law and takes no position on the validity under Pennsylvania law of any City ordinance or regulation.

## III. PARTIES

10. Plaintiff Susan Hess Herskovitz is an adult individual who resides at 508 Spruce Street, Philadelphia, Pennsylvania 19106, on the 500 block of Spruce Street, within the Corridor.

11. Ms. Herskovitz has impairments, alleged below, that substantially limit the major life activity of walking. She is an individual with a disability within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20)(B). She meets the essential eligibility requirements for using the City's streets and curbs and its curbside stopping, loading and parking, and she is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2). She sues on her own behalf and as representative of the Class and the Corridor Subclass defined below.

12. Plaintiff Carl J. Roeder is an adult individual who resides at 229 Pine Street, Philadelphia, Pennsylvania 19106, in the middle of the 200 block of Pine Street, on its bike-lane side, within the Corridor.

13. Mr. Roeder has impairments, alleged below, that substantially limit the major life activity of walking. He is an individual with a disability within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20)(B). He meets the essential eligibility requirements for using the City's streets and curbs and its curbside stopping, loading and parking, and he is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2). He sues on his own behalf and as representative of the Class and the Corridor Subclass defined below.

14. Defendant City of Philadelphia is a city of the first class and a political subdivision of the Commonwealth of Pennsylvania. The City is a public entity within the meaning of 42 U.S.C. § 12131(1)(A).

15. The City acts through its departments and offices, including its Department of Streets and that Department's managing office, the Office of Transportation and Infrastructure Systems ("OTIS"). (Ex. D at 1.) The City is the only defendant, and Plaintiffs seek relief against the City alone.

## IV. FACTS

### A. The No-Stopping Ban.

16. Pine Street and Spruce Street run east and west through Center City Philadelphia. In the Corridor, each carries a bicycle lane along one curb, on the left side of the street. (City, Spruce Pine Bike Lane Safety Upgrade Project Phase 1 Implementation FAQ (5.29.25), Ex. E at 1–2; Mem. from J. Brugger, OTIS, to Chief of Staff T. Thurman et al. (July 24, 2024) ("July 2024 OTIS Memo"), Ex. F at 1.) The lanes were installed in 2009. In 2019, after a fatal crash in 2017

and a serious crash in 2018, the City restriped both streets, moved the bike lanes to the left side "for increased visibility and traffic safety," and added flex posts at intersections to slow turning drivers. (Ex. F at 1.)

17. From 2009 until November 13, 2024, including after those 2019 safety changes, a driver on the Corridor could stop at the bike-lane curb to load or to let a passenger out. The City admits that, "[p]rior to this change in the law, it was illegal to park but not to stop or stand in a bicycle lane in Philadelphia," and that "prior to November 13, 2024, vehicle users could use bike lanes for loading if they did not exceed twenty minutes without financial penalty." (City Mot. for Summ. J., *Friends of Pine & Spruce v. City of Philadelphia*, Oct. Term 2025, No. 03241 (C.P. Phila.) ("City MSJ"), ¶¶ 3–4.) Councilmember Squilla explained the Corridor's history: "Pine and Spruce were the exception because they had no parking signs agreed on when the bike lanes were installed." (E-mail from Councilmember Squilla to R. Herskovitz (June 5, 2025), Am. Compl. Ex. D, *Friends of Pine & Spruce*, No. 00190.) Richard Montanez, the City's Deputy Commissioner of Streets in 2019, asked about the 2019 compromise "where this would be no parking, as opposed to no stopping," testified that he was "aware of the administration's compromise." (Ex. G, Dep. of Richard Montanez (July 29, 2025) ("Montanez Dep."), at 54:3–18.)

18. The Mayor signed Bill No. 240657 on November 13, 2024. (Certified Copy of Bill No. 240657, Ex. A at 4.) The Bill added to the list of places where no one may stop, stand or park a vehicle a new item: "(.11) Within a designated bicycle lane." (*Id.* at 1–2.) It deleted the former parking-only prohibition for bicycle lanes and set the fine at $75, and at $125 in a defined Center City and University City area. (*Id.* at 2–3.) "This Ordinance shall become effective immediately." (*Id.* at 3.)

19. The City acknowledges that the loading practice "was abolished by the passage of the 2024 Bike Lane Ordinance, which banned any stopping, standing, or parking in any bicycle lane." (City MSJ ¶ 5.) Its OTIS witness testified that the City acted "knowing that there was a significant amount of loading previously happening in the bike lane that would no longer be able to occur with the no standing -- or no stopping any time regulations when they went into effect." (Ex. H, Dep. of Kelley Yemen (July 29, 2025) ("Yemen Dep."), at 32:12–21.)

20. The only exception the Bill makes to the new item is the general one that governs the whole list: "Except when necessary to avoid conflict with other traffic or to protect the safety of any person or vehicle or in compliance with law or the directions of a police officer or official traffic-control device." (Ex. A at 1.) The Bill has no disability-specific exception. It makes no provision for a vehicle stopping briefly to let out or pick up a person with a mobility disability, for paratransit or for medical transport. (*Id.* at 1–4.) The prohibition applies in every designated bicycle lane in the City, not only in the Corridor. (*Id.* at 1–2.) This Complaint calls it the "No-Stopping Ban."

21. The City's public guidance tells residents what the No-Stopping Ban means at their doors: "If your destination is on the left/bike lane side of the street, the curbside regulation is No Stopping Anytime, which means a driver or vehicle cannot stop at any time in the lane. If your destination is on the right/non-bike lane side of the street, look for a loading zone or parking on that side." (Ex. E at 1–2.) "In a No Stopping Anytime area, all drivers and vehicles can get a ticket for stopping for any time period." (*Id.*) The guidance lists a "fee of $125/violation" for "[s]topping in a No Stopping Anytime bike lane" and announces enforcement by the Philadelphia Parking Authority. (*Id.* at 1.) It says nothing about residents or visitors with disabilities. (*Id.* at 1–2.)

**B. The loading zones and the planned concrete separation.**

22. In 2025 the City's Department of Streets converted significant portions of the curb parking on the non-bike-lane side of the Corridor to daytime loading zones. After a public hearing on May 2, 2025, the Department filed its report with the regulations "unamended," and the City states that the regulations took effect on June 2, 2025. (Dep't of Streets, Report on May 2, 2025 Public Hearing ("Streets Report"), Ex. D at 1–2, 12; Ex. E at 1–2; Ex. H at 32:1–9; E-mail from S. Scavuzzo, City Law Dep't (May 30, 2025), Ex. I at 1.) This Complaint calls them the "Loading Zone Regulations."

23. The City explained the design: "For a typical block, the loading zones are sized roughly 50 feet at the start of the block and 20 feet at the end of the block." (Ex. E at 1.) The zones revert to overnight parking in the evening. (*Id.*) The City represented that "all the signage consistent with the Loading Zone Regulations is installed and enforcement by the Philadelphia Parking Authority has begun." (City Opp. to Prelim. Inj. Mot., *Friends of Pine & Spruce v. City of Philadelphia*, June Term 2025, No. 00190 (C.P. Phila. Aug. 7, 2025) ("City PI Opp."), at 5.) The City said that the Bill's "prohibition on loading in bike lanes created a need for new loading zones on busy streets such as Pine and Spruce." (City MSJ ¶ 7.)

24. On August 13, 2025, the Court of Common Pleas enjoined the City "from eliminating any parking spaces to create new loading zones along the Spruce and Pine Corridor," and ordered it to "immediately cease and desist all ongoing construction, signage installation, enforcement efforts, or public works associated with the proposed 'neighborhood loading zones,' or related restrictions on Pine and Spruce Streets, pending further order of court." (Order, *Friends of Pine & Spruce*, No. 00190 (C.P. Phila. Aug. 13, 2025) ("Injunction Order"), at 1 ¶¶ 1–2.) The City reads that order as reaching the new loading zones and reports that it removed "the new loading zone signage along Pine and Spruce Streets in Center City." (City MSJ ¶¶ 33, 35.)

25. The No-Stopping Ban did not go away with the loading zones. The City told the state court in August 2026 that, with the loading zones removed, "there are very few places along the Spruce/Pine Corridor where vehicles can lawfully temporarily stop for loading," and that drivers now stop "in the bicycle lanes despite a ban on doing so and in the traffic lanes." (City's Rule 1925(b) Statement, *Friends of Pine & Spruce v. City of Philadelphia*, June Term 2025, No. 00190 (C.P. Phila. filed Aug. 20, 2026) ("City 1925(b) Statement"), ¶ 1(b).) On information and belief, the City and the Philadelphia Parking Authority continue to enforce the No-Stopping Ban throughout the City, including in the Corridor.

26. The City has since enacted legislation to restore the loading zones. Bill No. 250718-A, signed October 29, 2025, authorizes "[l]oading zones of any type, whether or not described in this Code," within a defined area and confirms and reestablishes the Department of Streets' loading-zone regulations. (Certified Copy of Bill No. 250718-A, Ex. J at 1–3.) Bill No. 251070, signed May 26, 2026, redrew that area. (Certified Copy of Bill No. 251070, Ex. K at 1–2.) The City has appealed the denial of its motion to dissolve the injunction, contending that Bill No. 250718-A authorizes the loading-zone regulations. (City 1925(b) Statement ¶ 1(a)–(b); Commw. Ct. Docket, No. 1065 C.D. 2026, at 1.) Those issues remain pending in the state courts.

27. The City has also proposed concrete separation along the Corridor's bike lanes. On July 18, 2024, a crash at the intersection of Spruce and 18th Streets killed Dr. Barbara Friedes. (Ex. F at 1.) Six days later, "[i]n response to" that crash, a July 24, 2024 OTIS memorandum to the Mayor's senior staff proposed "new concrete and planter separation along the bike lanes on Spruce and Pine Streets as well as replacing No Parking with No Stopping regulations, new loading zones, and moving religious institute relaxed parking to other streets," and recommended that the City "[a]dd concrete curb sections and planters in the existing painted buffer along each block of

Spruce and Pine Streets." (Ex. F at 1.) An August 2024 City presentation estimated the cost of concrete sections, planters and signs from Front to 22nd Street. (Ex. L at 8.)

28. The City sought money to build it. Its MTF Application describes a project "adding a concrete and planter separation to the 3.7 miles of bike lanes along Spruce and Pine Streets from Front St to 22nd Street in Center City Philadelphia." (MTF Application, Ex. B at 1.) The City requested $3,000,000, and the Commonwealth Financing Authority approved $650,000. (*Id.*) City notes of a March 21, 2025 working-group meeting record that the Mayor's proposed budget earmarked funds for the separation. (Ex. M at 1.) City staff recommended a Phase 2 pilot of separated bike lanes on roughly half the Corridor's blocks and, as a next step, "a funding and implementation plan for Phase 2, including design and installation of concrete bike lane separation." (Ex. N at 1.) The same staff memorandum records that the project "started in July 2024 after a drunk driver caused the fatal crash that killed Dr. Barbara Friedes, who was biking along Spruce Street." (*Id.*) The City has stated in its state-court discovery responses that "the placement of barriers has been proposed but neither designed nor implemented." (Def. City of Phila.'s Objs. & Resps. to Pls.' First Set of Interrogs. & Reqs. for Produc. of Docs., *Friends of Pine & Spruce*, No. 00190 ("City Discovery Resps."), Ex. O at 4 (Resp. to Req. for Produc. No. 1).)

## C. What the City knew and did not evaluate, and the request for modification.

29. The City knew from the start that the redesign threatened curb access for people with disabilities. OTIS's notes of a December 4, 2024 meeting with the Philadelphia Fire Department on the Corridor layouts record: "OTIS has a few other concerns, too: i. ADA access to curb." (Ex. P at 1.) OTIS's own planning methodology records: "While OTIS received request for installation of additional accessible parking spaces along Spruce and Pine, recently passed

legislation now ties these spaces to individuals and restricts parking in those spaces to that applicant." (Ex. Q at 1–2.)

30. The public told the City the same thing. The Streets Report records that "[m]any commenters expressed concern that the proposed regulations will remove 30% of available parking and fail to accommodate the needs of the elderly, families with young children, and people with disabilities who reside at or visit the properties along the streets impacted by the amended regulations." (Ex. D at 8.) The Department answered: "The Department believes the regulations balance the needs of the public with the residents of the impacted areas and will not alter the posted regulations in response to the comments described above." (*Id.* at 9.) The response offers no disability-specific exception or alternative for residents or visitors. (*Id.*)

31. The state court then found that, because the City had begun eliminating parking spaces to create the new loading zones, "older or disabled residents would now be forced to walk up to an entire city block to exit a vehicle or unload items that must be carried back to their homes." (Mem., *Friends of Pine & Spruce*, No. 00190 (C.P. Phila. Aug. 13, 2025), at 5.) The City now tells the courts that the injunction "has harmed members of the public, including elderly and disabled persons, because by removing the disputed loading zones, there are very few places along the Spruce/Pine Corridor where vehicles can lawfully temporarily stop for loading," which "limits Corridor users' access to their homes." (City 1925(b) Statement ¶ 1(b).) The City sited those loading zones near the corners. (Ex. H at 36:16–37:4, 67:13–68:1.)

32. On information and belief, the City has made no documented evaluation of how a person who cannot walk the length of a block reaches a door on the bike-lane side of a block once stopping there is forbidden. Asked whether the City performed "any specific analysis" of the changes' impact on disabled or elderly residents, the City's OTIS witness described where the

loading zones were placed: "we located loading zones near the corners so that people would have a safe place to cross the street if they needed to access the other side of the street. And that was one of our primary considerations, was making sure that people had drop-off locations near locations with ADA ramps and controlled crossing." (Ex. H at 36:16–37:4.) She testified that "[i]f there was a particular need there would be one added mid-block" (*id.* at 55:14–15), and she recalled no discussions, analysis or studies in the City's communications with Council members before Bill No. 240657 passed "specific to the adverse impact they could have on the elderly or disabled": "Not to my knowledge." (*Id.* at 37:11–17.) She believed the City "took into account the disabled and the elderly," by placing the loading zones near intersections with ADA ramps, and had "not heard of a human factors analysis for this type of work before." (*Id.* at 67:13–68:1.)

33. The City's documents match that testimony. The July 24, 2024 memorandum that proposed the No Stopping regulation lists the project's known risks and identifies no accessibility risk among them; the first risk it lists is "A government people can see, touch, and feel," with the note "Calls for rapid infrastructure and policy responses from City Council members and residents." (Ex. F at 1.) The memorandum weighs no alternative to the No Stopping regulation and says nothing about how people with mobility disabilities would reach their doors. (*Id.*) Asked to produce any engineering studies, safety reviews or human factor evaluations of the loading zones or barriers, the City pointed to a camera study for the loading zones and stated that it had no documents on the barriers. (Ex. O at 4.) A Corridor resident testified that, to his knowledge, Council's Committee on People with Disabilities and Special Needs held "[n]o hearing and no research" on the 2025 loading-zone bill. (Ex. R, Dep. of Lloyd Brotman, Ph.D. (May 28, 2026) ("Brotman Dep."), at 36:13–38:5.)

34. On December 18, 2025, DRP wrote to Michael Carroll, P.E., Deputy Manager of OTIS, and to Zach Strassburger, Esquire, Deputy City Solicitor, ADA Compliance, under the heading "Request for Reasonable Accommodation / Bicycle Lanes." (Letter from M. Scott, DRP, to M. Carroll & Z. Strassburger (Dec. 18, 2025) ("DRP Letter"), Ex. C at 1.) DRP wrote about "neighbors with mobility disabilities who live on the 500 block of Spruce Street (Center City) and on 48th Street (West Philadelphia)," and stated that the City's prohibition on stopping and loading in the lanes "has and continues to prevent them from safely entering and exiting their homes." (*Id.* at 1–2.) The DRP Letter invoked Title II of the Americans with Disabilities Act, its reasonable-modification regulation and Section 504 of the Rehabilitation Act. (*Id.* at 2.)

35. DRP wrote: "I hereby formally request a reasonable accommodation — that the City retract and remove the prohibition on stopping and loading in the Lanes, cancel its plans to install concrete curbs around the Lanes, and otherwise implement its Vision Zero Action Plan 2030 in a manner that allows individuals with disabilities to freely enter and exit their premises, to have access to their transportation, and to move about in the community." (*Id.* at 3.) It asked the City to respond "by January 10, 2026." (*Id.*)

36. The City has the DRP Letter: it objected on relevance, authentication and hearsay grounds when the letter was offered in the state-court proceedings. (City 1925(b) Statement ¶ 2(a).) Ms. Herskovitz's husband, asked under oath what the City's response to the DRP Letter's request was, answered: "Zero." (Ex. S, Hr'g Tr., *Friends of Pine & Spruce*, No. 00190 (C.P. Phila. June 2, 2026), at 93:23–94:9.) On information and belief, the City has not responded to the DRP Letter, and it has granted no modification of the No-Stopping Ban for any person with a disability. On information and belief, Ms. Herskovitz is among the neighbors on the 500 block of Spruce Street for whom DRP wrote.

**D. Ms. Herskovitz.**

37. Ms. Herskovitz lives at 508 Spruce Street, within the Corridor. (Ex. S at 78:22–79:2, 79:12–15.) She is 85 years old. She has had two brain tumors, surgery for lung cancer and a hip replacement. She has RSD, which affects the feeling in her left foot, and suffers from lower back pain, degenerative disc disease and lumbar spinal stenosis. She cannot walk long distances or carry heavy bags, and she is unsteady on her feet. She can walk about half a block, and only with support: she steadies herself with walking poles or by holding on to her husband or whoever is with her. She also has autonomic dysfunction: her blood pressure is unstable, and she can become light-headed without warning when she stands. In July 2025 her physician certified to the Philadelphia Parking Authority that she cannot walk half a block without assistance, that she has difficulty walking because of severe degenerative disc disease and her history of brain tumors, and that her disability is permanent. She has fallen on the sidewalk, and in 2019 she broke a bone in her foot stepping off a curb. Her husband testified under oath that she "is handicapped legally." (Ex. S at 79:12–15.)

38. The bike lane runs along the curb in front of Ms. Herskovitz's home. (Ex. S at 94:24–95:4; *see* E-mail from R. Herskovitz to Councilmember Squilla (June 5, 2025), Am. Compl. Ex. D ("What happens when we need to unload our car at our door and it's in the bike lane?").) She can drive but does not now; she relies on her husband to drive her, and on Uber when no one can go with her. She has a medical appointment or test almost every week. She needs a vehicle to stop in the bike lane to unload and for pickup or delivery by Uber. She has had a handicapped parking space for more than ten years; when the City moved the bike lane, the space moved across the street. (Ex. S at 79:19–22, 80:3–9.) Someone else parks in that space about once a week, and reaching her door from it means crossing the street, which is dangerous for her when leaves, acorns

or snow cover the ground. The No-Stopping Ban forbids the stop at her door that she needs. (Ex. A at 1–2; Ex. E at 1–2.)

39. In the spring of 2026, her son drove Ms. Herskovitz and her husband home. Because the No-Stopping Ban forbade a stop in the bike lane at their door, he stopped in the driving lane. Ms. Herskovitz got out and "just about collapsed," and had to be helped across the bike lane into the house. (Ex. S at 92:5–16.) Since the No-Stopping Ban took effect, cyclists have harassed her when an Uber stopped to pick her up, and she has occasionally had to pay tickets. The ban follows her away from home as well: when she is driven to places along curbside bike lanes, on Spruce and Pine Streets and elsewhere in the City, the driver must let her out in the driving lane. Ms. Herskovitz intends to continue living at 508 Spruce Street, where she and her husband plan to age in place.

**E. Mr. Roeder.**

40. Mr. Roeder has lived at 229 Pine Street since January 2017. His home is in the middle of the block, on the bike-lane side. (Ex. T, Dep. of Carl Roeder (July 17, 2025) ("Roeder Dep."), at 5:8–6:1.) He is in his late sixties; he testified in July 2025 that he was sixty-six. (*Id.* at 5:11–12.)

41. A 1988 automobile accident left Mr. Roeder with about thirty fractures of his legs, a partially amputated hip, and fractures of his lower and upper spine that continue to deteriorate, including cervical vertigo that brings on sudden disorientation when he moves. Nerve damage causes neuropathy and loss of sensation in both legs. He is undergoing chemotherapy, which worsens his balance and his neuropathy. (*Id.* at 6:10–8:22, 13:19–22.) He walks with a cane and has used a walker and wheelchairs. He falls without warning while walking on the sidewalk, and he has stopped walking for exercise because it is "just simply too hazardous." (*Id.* at 9:1–21,

12:20–23.) His condition has worsened since he testified. He has been hospitalized four times in 2026, twice solely because he fell. He can walk only about 100 feet, measuring each step and watching the ground, and sudden episodes of increased paralysis in his legs, which come without warning, throw off his balance, including when he gets into or out of a car. He rarely leaves home except for medical appointments.

42. Mr. Roeder does not own a car. He travels by taxi or rideshare about 98 percent of the time, and his medications and groceries are delivered to his door. (*Id.* at 13:6–18, 16:24–17:10.) He goes to every medical appointment by Uber. Car-sharing has largely left his neighborhood, so he has no ready access to a rental car. Getting in and out of a vehicle is hard for him even at the curb in front of his home; he uses hand-holds to do it. (*Id.* at 10:14–16, 11:1–5.) He testified that, without curbside access, "I would be barricaded in my residence. I would not be able to, in a manner that would be safe and efficient, to access a motor vehicle, a cab, an Uber, to attend medical appointments." (*Id.* at 10:6–9.) Across the street from his home there is only parking, and walking to the end of his block to reach a vehicle would take him about five minutes; he called it "just tempting fate." (*Id.* at 11:13–12:3.)

43. On or about June 26, 2025, an Uber driver bringing Mr. Roeder home "did not want to park in the bike lane" and let him out "in the middle of the street" in front of 229 Pine Street. Mr. Roeder stepped out of the car, his foot slipped out from under him, and he fell. He reported the fall to the Philadelphia Police Department. (*Id.* at 10:17–25, 15:13–23, 18:19–19:5, 20:1–8.) Ambulances that came for him twice in early 2025 had trouble parking on his street (*id.* at 19:6–15), and each ambulance trip to his home has required closing the street. Since the City announced the No-Stopping Ban, rideshare drivers have refused to pull up to his curb. On October 2, 2025, he fell again getting out of an Uber at 229 Pine Street, and he again reported the fall to the police.

He has slipped and partially fallen more times than he can count; being let out in the street makes it worse because of the curve of the roadway, and wet leaves and dusty pavement have brought him close to falling. As recently as November 2, 2026, an Uber driver refused to pull up to his curb; rather than step into the street, Mr. Roeder let the driver leave and called another car. He has seen delivery drivers on Pine Street ticketed for stopping in the bike lane.

44. Mr. Roeder has made 229 Pine Street his home since January 2017. He intends to continue living there and does not expect to move.

**F. The same burden wherever the ban applies.**

45. Nothing about this burden depends on the Corridor. The No-Stopping Ban is a single item of the Traffic Code, "(.11) Within a designated bicycle lane," and it applies by its terms to every designated bicycle lane in the City, including every block of the Corridor. (Ex. A at 1–2; Ex. E at 1 ("along both bike lanes on Spruce and Pine Streets from Front to 22nd Streets").) The Bill sets a $125 fine within a defined Center City and University City area and a $75 fine everywhere else. (Ex. A at 2–3.) By the City's own account, before the Bill the Traffic Code forbade parking, but not stopping or standing, in a bicycle lane in Philadelphia. (¶ 17.) DRP told the City of neighbors with mobility disabilities outside the Corridor, on 48th Street in West Philadelphia. (Ex. C at 1–2.)

46. The City's Corridor guidance gives every bike-lane-side resident there the same answer: no stopping at the door, and a loading zone or parking space somewhere else. (Ex. E at 1–2.) On information and belief, the City applies the same rule, with no exception, along every other designated bicycle lane, so that a person with a mobility disability who lives along such a curb faces the same answer. The Corridor is where the record of the ban's effect is most fully developed; it is not where the ban ends.

47. Other Corridor residents face the same wall. Lloyd Brotman, Ph.D., who lives on the 2100 block of Pine Street and is the president of Friends of Pine & Spruce, a plaintiff in the state-court action, testified that at 76, five years after back surgery, he is "not as stable as I once was," and that "having to, you know, walk hundreds of feet" is a major concern. (Ex. R at 1, 38:14–23, 41:17–42:3 (May 28, 2026).) Coming home by Uber with a family member, he faced the choice the City's regime leaves: "Do we break the law by stopping in the bike lane or do we break the law by stopping in the traffic lane?" (*Id.* at 39:11–17.)

48. A person who can walk from a corner loading zone, a parking space or the opposite curb pays a few steps for the No-Stopping Ban. A person who cannot walk a block, or cannot carry what she brings, may have no practical way from the vehicle to the door, and the City has identified no disability-specific process through which she may obtain a lawful stop at or near it: it declined to alter the loading-zone regulations in response to concerns about the elderly and disabled, pointing to where it placed the loading zones (Ex. D at 8–9), and it says that "very few places" remain on the Corridor where vehicles can lawfully stop (City 1925(b) Statement ¶ 1(b)).

## G. Related proceedings and the Liberty Resources settlement.

49. Two actions in the Court of Common Pleas of Philadelphia County challenge the Loading Zone Regulations and related legislation under Pennsylvania law: *Friends of Pine & Spruce v. City of Philadelphia*, June Term 2025, No. 00190, and *Friends of Pine & Spruce v. City of Philadelphia*, October Term 2025, No. 03241. The court in the first action entered the Injunction Order and denied the City's motion to dissolve it on December 31, 2025, and again by an order dated July 6, 2026 and docketed July 13, 2026. (Injunction Order, at 1; Order (C.P. Phila. Dec. 31, 2025); Order (C.P. Phila. July 6, 2026).) The City's appeal is pending in the Commonwealth Court at No. 1065 C.D. 2026. (Commw. Ct. Docket, No. 1065 C.D. 2026, at 1 (printed Aug. 24, 2026).)

In the second action, the City moved for summary judgment in October 2026. (City MSJ.) Neither Ms. Herskovitz nor Mr. Roeder is a party to either action. (*See* Order (C.P. Phila. Dec. 31, 2025), at 1 (caption); Stip. to Extend Time, *Friends of Pine & Spruce*, No. 03241 (Nov. 3, 2026), at 1 (caption).)

50. In *Liberty Resources, Inc. v. City of Philadelphia*, No. 2:19-cv-03846-HB (E.D. Pa.), this Court certified a Rule 23(b)(2) class of persons with disabilities or impairments that affect their mobility who use or will use the City's pedestrian rights of way, and approved a class settlement concerning the City's "Pedestrian Facilities." (Settlement Agreement ("Liberty Settlement Agreement"), Recitals C, E; Order, Doc. 164 (May 1, 2023).) The Liberty Settlement Agreement defines Pedestrian Facilities as "any curb ramps, crosswalks, sidewalks, pathways, or other structures or walks used by pedestrians" within the City's right of way, responsibility or boundaries. (*Id.* § 1.12.) It runs for fifteen years from final approval, and this Court retained jurisdiction to enforce it. (*Id.* §§ 1.6, 2, 9; Order, Doc. 164.) Members of the *Liberty Resources* settlement class released, and agreed not to sue on, claims for injunctive or declaratory relief related to the accessibility, installation, remediation or maintenance of Pedestrian Facilities during that period. (Liberty Settlement Agreement §§ 12.2–12.3.)

51. This action does not seek to enforce the Liberty Settlement Agreement. It challenges the City's rule against stopping in a designated bicycle lane, a regulation of where vehicles may stop in the roadway, which is not a curb ramp, crosswalk, sidewalk or other structure used by pedestrians, and it seeks related modifications of the City's curbside stopping program. (Ex. A at 1–2; Ex. E at 1.) It seeks no relief concerning the design, installation, remediation or maintenance of any curb ramp, crosswalk or sidewalk. Plaintiffs do not allege that any curb ramp,

crosswalk or sidewalk is inaccessible or noncompliant; the obstacle this action challenges is the prohibition on stopping, not the condition of any Pedestrian Facility.

## V. CLASS ACTION ALLEGATIONS

52. Plaintiffs bring this action individually and, under Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(c)(5), on behalf of the class and the subclass defined below. (Loc. R. Civ. P. 23.1(b)(1).) Plaintiffs ask that they be appointed representatives of both and that their counsel be appointed class counsel under Rule 23(g).

53. The class (the "Class") is defined as:

> All persons with a disability that substantially limits walking (a "mobility disability") who reside at a residence in Philadelphia in front of which a designated bicycle lane runs along the curb, and who travel to or from that residence by motor vehicle.

54. The subclass (the "Corridor Subclass") is defined as:

> All members of the Class whose residence is on Pine Street or Spruce Street between Front Street and 22nd Street.

55. Rule 23 permits a class to be divided into subclasses "that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). The Class and the Corridor Subclass divide the claims by what proves them. The Class pursues Count I and, to the extent it rests on the conduct alleged in Count I, Count III, together with the declaration and the stopping exception sought below; each of those turns on the text of the No-Stopping Ban, which is the same on every designated bicycle lane in the City. The Corridor Subclass pursues Count II and, to the extent it rests on the conduct alleged in Count II, Count III, together with the Corridor evaluation sought below; each of those turns on the City's curbside program in the Corridor, where the record of the ban's effect has been made. The Class also seeks the individualized residential process described below, because every member of the Class resides along a designated bicycle lane.

56. Neither the Class nor the Corridor Subclass seeks relief concerning the accessibility, installation, remediation or maintenance of Pedestrian Facilities as defined in § 1.12 of the Liberty Settlement Agreement. The class claims concern whether a vehicle carrying a person with a mobility disability may stop briefly in a designated bicycle lane to let that person in or out, and the related modifications of the City's curbside stopping program sought below. Excluded from the Class and the Corridor Subclass are the judicial officers assigned to this action and their staffs.

57. Each element of the definitions is objective and can be determined from the person's own circumstances: a disability that limits walking, a residence in front of which a designated bicycle lane runs along the curb, travel to or from that residence by motor vehicle, and, for the Corridor Subclass, the street and block on which the residence sits. A Rule 23(b)(2) class seeking only declaratory and injunctive relief need not meet any ascertainability requirement. *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). The Class and the Corridor Subclass seek only declaratory and injunctive relief and no damages.

58. The precise number of Class members is not presently known to Plaintiffs. On information and belief, the Class and the Corridor Subclass are each so numerous that joinder of all members is impracticable. (Loc. R. Civ. P. 23.1(b)(2)A.) The No-Stopping Ban applies in every designated bicycle lane in the City (Ex. A at 1–2), and the Corridor alone includes 3.7 miles of bike lanes (MTF Application, Ex. B at 1). On information and belief, the City's designated bicycle lanes run for many miles beyond the Corridor, in neighborhoods across the City, including West Philadelphia (¶ 45). On information and belief, the City holds records that will identify Class members, including records of the accessible parking spaces that, under recent legislation, are tied to individual applicants along Spruce and Pine (Ex. Q at 1–2); Plaintiffs will seek them before

moving for certification. OTIS has received a request for additional accessible parking spaces along Spruce and Pine (Ex. Q at 1–2); many public commenters raised the needs of people with disabilities who live on the affected blocks (Ex. D at 8); DRP wrote on behalf of neighbors with mobility disabilities on Spruce Street in Center City and on 48th Street in West Philadelphia (Ex. C at 1–2); and the City itself says that elderly and disabled persons have been harmed because very few places remain in the Corridor where a vehicle can lawfully stop for loading, which limits Corridor users' access to their homes (City 1925(b) Statement ¶ 1(b) (attributing that scarcity to the state-court injunction)). Another elderly Corridor resident has testified under oath to the same burden that Plaintiffs bear. (Ex. R at 38:14–40:2.)

59. On information and belief, joinder is impracticable for further reasons. Class membership is fluid: residents age into mobility disabilities, people with disabilities move onto blocks along bicycle lanes, and others leave, so the Class and the Corridor Subclass will change while the No-Stopping Ban remains in force. Many Class members, by the nature of their disabilities, are less able to bring and attend separate suits, and none would gain from an individual action anything that one class-wide order would not give them.

60. Questions of law and fact are common to the Class and to the Corridor Subclass. (Loc. R. Civ. P. 23.1(b)(2)C.) The class claims rest on a single ordinance, applied to every Class member alike, and on a single curbside program in the Corridor. The common questions include:

(a) whether the No-Stopping Ban (Ex. A at 1–4) contains any disability-specific exception or any process by which a person with a mobility disability may ask for one;

(b) whether Title II of the ADA and Section 504 of the Rehabilitation Act require the City to reasonably modify the No-Stopping Ban so that a vehicle carrying a person

with a mobility disability may stop briefly at the curb to let that person in or out, and whether any such modification would fundamentally alter the City's program;

(c) whether the City's curbside stopping program along the Corridor's bicycle lanes, viewed in its entirety, is readily accessible to and usable by persons who cannot walk the distance from a lawful stopping place to the residence they live in;

(d) whether the City has made any written determination that such access would fundamentally alter the program or impose an undue burden;

(e) whether the City has documented any evaluation of how a person with a mobility disability reaches a residence along the Corridor's bicycle lanes from a lawful stopping place; and

(f) whether the City may continue to enforce the No-Stopping Ban against vehicles carrying Class members without a reasonable modification.

61. Questions (a), (b) and (f) are common to every member of the Class, wherever in the City the member lives. Questions (c), (d) and (e) are common to every member of the Corridor Subclass. Each question has one answer for the whole group to which it is common. The ordinance either has a disability exception or it does not, everywhere it applies; the Corridor program is either accessible or it is not. The answers will resolve the class claims in one stroke.

62. Plaintiffs' claims are typical of the claims of the Class and of the Corridor Subclass. Each lives within the Corridor at a residence whose curb adjoins a designated bicycle lane, Ms. Herskovitz at 508 Spruce Street and Mr. Roeder at 229 Pine Street; each has a disability that limits walking; and each needs a vehicle to stop at or near the residence, as alleged above. That they live in the Corridor does not set their claims apart from those of Class members elsewhere in the City: the same item of the ordinance forbids a stop at their doors and at every other Class member's door, and their class claims rest on the same legal theories.

63. Plaintiffs will fairly and adequately protect the interests of the Class and the Corridor Subclass. (Loc. R. Civ. P. 23.1(b)(2)B(i).) They seek for the Class and the Corridor Subclass the same declaratory and injunctive relief they seek for themselves, they seek no damages, and neither has any interest antagonistic to the interests of other Class members. Each is willing to serve as a class representative and understands the duties that service carries.

64. Plaintiffs' counsel, Bochetto Lentz & Heim, P.C., 1524 Locust Street, Philadelphia, Pennsylvania 19102, will fairly and adequately represent the interests of the Class and the Corridor Subclass and should be appointed class counsel under Rule 23(g). Counsel has investigated the claims in this action, including through the record of the related state-court actions, the depositions of City witnesses and the City's document production and discovery responses. Counsel has litigated the City actions at issue here in the Court of Common Pleas and the Commonwealth Court since 2025. Counsel knows the applicable law and will commit the resources necessary to represent the Class and the Corridor Subclass.

65. The Class and the Corridor Subclass may each be maintained under Rule 23(b)(2) because the City has acted or refused to act on grounds that apply generally to each. It enacted, and keeps in force, one no-stopping rule with no disability-specific exception for every designated bicycle lane in the City, and it runs one curbside program in the Corridor. Final injunctive relief and corresponding declaratory relief are therefore appropriate for each as a whole. The declaration and the stopping exception would give relief to every Class member at once; the residential process applies alike to every Class member, each of whom resides along a designated bicycle lane; and the Corridor evaluation applies alike to every member of the Corridor Subclass. The Court is not asked to fashion a separate decree for each member's door. *See Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 360 (2011). Each Plaintiff's request for a modification at that Plaintiff's own residence is pleaded as an individual claim. (¶¶ 66, 81.)

66. Each Plaintiff also asserts, on that Plaintiff's own behalf, a claim for a reasonable modification at that Plaintiff's own home, on the facts of that Plaintiff's own experience, as alleged above. Those individual claims do not depend on certification, and the class claims do not depend on them.

67. Plaintiffs will move for class certification on the schedule the Court sets under Local Rule of Civil Procedure 23.1(c).

## VI. CLAIMS FOR RELIEF

### A. Count I — Title II of the ADA, 42 U.S.C. §§ 12131(2), 12132; 28 C.F.R. § 35.130(b)(7)(i) (reasonable modification): the City must modify a no-stopping rule that has no disability-specific exception, because without one a person who cannot walk a block cannot be let out at the door.

68. Plaintiffs, individually and on behalf of the Class, incorporate the foregoing paragraphs as if set forth here in full.

69. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

70. The City is a public entity. 42 U.S.C. § 12131(1)(A). The City's streets and curbs are a "facility," which includes "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property." 28 C.F.R. § 35.104; *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 & n.3, 1073 (3d Cir. 1993). The City's regulation of who may stop, load and park at those curbs is a service, program or activity of the City.

71. Each Plaintiff and each member of the Class has an impairment that substantially limits walking and meets the essential eligibility requirements of the City's curbside program, which is open to everyone who arrives by vehicle. Each is a qualified individual with a disability. 42 U.S.C. § 12131(2).

72. Title II reaches every such individual "with or without reasonable modifications to rules, policies, or practices." 42 U.S.C. § 12131(2). The Department of Justice's regulation states the duty: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The duty draws on Section 504: "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

73. The No-Stopping Ban is a rule, policy and practice of the City. It forbids stopping in a designated bicycle lane (Ex. A at 1–2), and the City has told the public that any vehicle that stops there for any time can be ticketed (Ex. E at 1–2). The ordinance's safety carve-out (Ex. A at 1) is not a disability-specific exception, and the ordinance contains none. The City has published no process by which a person with a mobility disability may ask for an exception to the No-Stopping Ban. Under recent legislation, an accessible parking space is tied to an individual applicant (Ex. Q at 1–2), and the loading zones the City added during the 2025 design serve general neighborhood loading on the side of the street away from the bike lane (Ex. E at 1–2); neither provides for a vehicle to stop at a bike-lane-side door. The City treats the ban as governing law. (City MSJ ¶¶ 5, 7; City 1925(b) Statement ¶ 1(b).)

74. A person who can walk a block, and carry what she brings, can be let out at a corner or across the street and walk to the door. Ms. Herskovitz cannot walk long distances or carry heavy bags, has fallen on the sidewalk, and cannot count on the accessible space across the street (¶¶ 37–38); getting from the opposite curb to her door requires her to cross Spruce Street, including the bike lane, on foot, steadied by walking poles or another person's arm, without knowing when she will become light-headed. Mr. Roeder walks with a cane, can walk only about 100 feet, falls without warning, and has only parking across the street; reaching a vehicle at the end of his block would take him about five minutes on foot (¶¶ 41–43). Each member of the Class, by definition, has a disability that substantially limits walking and travels to or from home by motor vehicle (¶ 53).

75. Two modifications are necessary to avoid that discrimination:

(a) a brief stopping exception, wherever the No-Stopping Ban applies in the City, permitting a vehicle carrying a person with a mobility disability to stop in a designated bicycle lane for the brief time reasonably needed to let that person, and what that person must carry, in or out, subject to reasonable conditions the City may set to protect cyclists; and

(b) an individualized process through which a resident with a mobility disability whose home adjoins a designated bicycle lane may request, and promptly receive a written decision on, residential disability parking or loading at or near the resident's door.

76. Both modifications are reasonable on their face. Each is limited to vehicles serving people with mobility disabilities; the first lasts only for the brief time reasonably needed to let the person in or out. Neither repeals the No-Stopping Ban, and Plaintiffs do not seek its repeal. The second builds on a channel the City already uses: it ties accessible parking spaces along Spruce

and Pine to individual applicants (Ex. Q at 1–2). On information and belief, that channel provides no loading at a resident's door.

77. The City knew that curb access for people with disabilities was at stake. (Ex. P at 1 (item 2.c.i: "ADA access to curb"); Ex. D at 8–9; City 1925(b) Statement ¶ 1(b) (asserting that elderly and disabled persons are harmed when very few places remain where vehicles can lawfully stop for loading).) The DRP Letter gave it written notice of the same need, on Spruce Street in Center City and on 48th Street in West Philadelphia; it asked the City to retract the prohibition and cancel its plans for concrete curbs, named no individual, and drew no response that appears in the record. (Ex. C at 1–3.)

78. "What matters under the ADA are not formalisms about the manner of the request," but whether the entity "can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (Title I). Even under a rule requiring a specific request, a public entity that knew of a person's disability but did not discuss related issues with him may not defend on the absence of one. *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001). Plaintiffs request both modifications by name in this Complaint.

79. On information and belief, the City has made neither modification and has not determined, for either Plaintiff or any member of the Class, whether either is reasonable.

80. The City bears the burden of showing that a modification would fundamentally alter the nature of its program. 28 C.F.R. § 35.130(b)(7)(i). Neither modification would change the nature of a curbside-safety program that already provides for loading zones and accessible spaces. For fifteen years, including after its 2019 safety overhaul, the City ran the Corridor's bike lanes while drivers could stop at the curb (¶¶ 16–17); letting a vehicle carrying a person with a mobility

disability do so briefly cannot fundamentally alter that program. Any safety requirement the City invokes must be "based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 35.130(h).

81. Plaintiffs bring this Count for the Class, against a policy applied to all of its members wherever in the City they live, and each Plaintiff brings it individually, for a stopping modification where the No-Stopping Ban bars a vehicle carrying that Plaintiff from stopping at the curb of the residence the Plaintiff lives in.

**B. Count II — Title II of the ADA, 42 U.S.C. § 12132; 28 C.F.R. §§ 35.149, 35.150(a) (program access): the City's curbside stopping program along the Corridor's bicycle lanes, viewed in its entirety, is not readily accessible to a person who cannot walk a block, and the City has made no written determination that would excuse it.**

82. Plaintiffs, individually and on behalf of the Corridor Subclass, incorporate the foregoing paragraphs as if set forth here in full.

83. No qualified individual with a disability may, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from or denied the benefits of its services, programs or activities. 28 C.F.R. § 35.149. "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). That duty reaches "all normal governmental functions, including the provision of on-street public parking." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1103 (9th Cir. 2014).

84. The benefit the City's curbside program provides along the Corridor's bicycle lanes is getting a person from a vehicle to the home. Before the No-Stopping Ban, the City's program let a driver stop briefly in the bike lane for that purpose; the City admits the ban "abolished" that practice. (City MSJ ¶¶ 3–5.) The City may not now define the benefit as a right to stop only where it has chosen to allow stopping: "[t]he benefit itself, of course, cannot be defined in a way that

effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." *Choate*, 469 U.S. at 301.

85. Viewed in its entirety, the program is not readily accessible to or usable by people who cannot walk or roll from wherever a vehicle may lawfully stop to a midblock door. By the City's own account, few places remain in the Corridor where a vehicle may lawfully stop for loading. (City 1925(b) Statement ¶ 1(b).) The loading zones the City chose as its substitute, preliminarily enjoined in August 2025 (City MSJ ¶¶ 33, 35), were sited near corners with ADA ramps and controlled crossings (Ex. H at 36:16–37:4, 67:13–68:1). The obstacle is not the corner ramp but the distance the No-Stopping Ban forces a person who cannot walk a block to cover. Plaintiffs bring this Count individually and for the Corridor Subclass, whose members live where that record was made.

86. The City's OTIS witness knew of no analysis, before the Bill passed, specific to its adverse impact on elderly or disabled residents. (Ex. H at 37:11–17.) On information and belief, the City has made no documented evaluation of how a person who cannot walk a block gets from a vehicle to a midblock door along the Corridor's bicycle lanes.

87. A refusal to provide program access on grounds of fundamental alteration or undue burden "must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.150(a)(3). On information and belief, no such decision or written statement exists for the No-Stopping Ban in the Corridor.

**C. Count III — Section 504 of the Rehabilitation Act, 29 U.S.C. § 794: the City excludes residents with mobility disabilities solely by reason of their disability from a program that, on information and belief, receives federal financial assistance.**

88. Plaintiffs, individually and on behalf of the Class and the Corridor Subclass, incorporate the foregoing paragraphs as if set forth here in full.

89. Section 504 provides that no otherwise qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A "program or activity" means "all of the operations of" a department, agency or other instrumentality of a local government, any part of which is extended federal financial assistance. 29 U.S.C. § 794(b)(1)(A). "With limited exceptions, the same legal principles govern ADA and RA claims." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013). The exceptions are the funding element and Section 504's "solely by reason of" causation. *Id.* at 235–36.

90. On information and belief, the City departments that adopted, administer and enforce the No-Stopping Ban, including OTIS and the Department of Streets, receive federal financial assistance. *See* Ex. U at 1–2 (City Controller single-audit report for fiscal year ended June 30, 2022, identifying "Highway Planning and Construction," Assistance Listing No. 20.205, among the City's major federal programs). All of the operations of each such department are therefore a program or activity receiving federal financial assistance. 29 U.S.C. § 794(b)(1)(A).

91. Each Plaintiff and each member of the Class is an otherwise qualified individual with a disability.

92. The conduct alleged in Count I, as to the Class, and in Count II, as to the Corridor Subclass, excludes them from, denies them the benefits of, and subjects them to discrimination under that program solely by reason of their disability. The City's safety goal does not explain the

exclusion: only an inability to walk from where a vehicle may lawfully stop to the door keeps a Class member from getting there.

**D. Plaintiffs, the Class and the Corridor Subclass have standing, their claims are timely, and they are entitled to prospective relief.**

93. Plaintiffs, the Class and the Corridor Subclass suffer a present and continuing injury: the No-Stopping Ban, in force along every designated bicycle lane in the City without a disability-specific exception, denies them a lawful stop where they can get from a vehicle to the residence they live in, as alleged in the foregoing paragraphs. An order granting the modifications and evaluation sought here would redress that injury.

94. Each act on which these Counts rest occurred within two years before this action was filed: the City's enactment of the No-Stopping Ban, signed November 13, 2024 (Ex. A at 4), and the passing of the DRP Letter's January 10, 2026 date with no response in the record (Ex. C at 3). Plaintiffs seek only prospective relief.

95. Plaintiffs, the Class and the Corridor Subclass have no adequate remedy at law. They are entitled to declaratory and injunctive relief, *see* 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2), and, as prevailing parties, may be awarded reasonable attorneys' fees, litigation expenses and costs. 42 U.S.C. § 12205; 29 U.S.C. § 794a(b).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and the Corridor Subclass, respectfully request that the Court enter judgment for them, the Class and the Corridor Subclass and against the City of Philadelphia and grant the following relief:

A. An order certifying the Class and the Corridor Subclass defined in the Class Action Allegations under Fed. R. Civ. P. 23(a), (b)(2) and (c)(5), appointing Plaintiffs as

representatives of each and Bochetto Lentz & Heim, P.C. as class counsel under Fed. R. Civ. P. 23(g).

B. A declaration, for the Class, under 28 U.S.C. §§ 2201–2202 that the No-Stopping Ban enacted by Bill No. 240657, without a disability-specific exception or a process for requesting one, violates Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

C. A preliminary and permanent injunction requiring the City, its officers, agents and employees, and all persons acting in concert with them, for the Class as to items 1 and 2 and for the Corridor Subclass as to item 3:

1. to adopt, publish and honor an exception to the No-Stopping Ban, wherever it applies in the City, that permits a vehicle carrying a person with a mobility disability to stop in a designated bicycle lane for the brief time reasonably needed to let that person, and what that person must carry, in or out, subject to reasonable conditions the City may set to protect cyclists;

2. to establish and administer an individualized process through which a resident with a mobility disability whose home adjoins a designated bicycle lane may request, and promptly receive a written decision on, residential disability parking or loading that reaches that resident's door; and

3. to conduct and document an evaluation of whether on-street stopping, loading and parking in the Corridor are accessible to persons with mobility disabilities.

D. An order retaining jurisdiction to enforce this relief and resolve disputes over the City's compliance.

E. An award of reasonable attorneys' fees, litigation expenses and costs under 29 U.S.C. § 794a(b), as made available in Title II actions by 42 U.S.C. § 12133, and under 42 U.S.C. § 12205.

F. Such other and further relief as the Court deems just and proper.

Plaintiffs seek no damages, and none of Plaintiffs, the Class or the Corridor Subclass seeks relief concerning Pedestrian Facilities as defined in § 1.12 of the Liberty Settlement Agreement or to enforce that agreement.

Respectfully submitted,

**BOCHETTO LENTZ & HEIM, P.C.**

Dated: November 12, 2026

By: */s/ Brett E. Stander*

George Bochetto, Esquire
Attorney I.D. No. 27783
Brett E. Stander, Esquire
Attorney I.D. No. 335798
1524 Locust Street
Philadelphia, PA 19102
Tel.: (215) 735-3900
Fax: (215) 735-2455
gbochetto@blhlegal.com
bstander@blhlegal.com

*Attorneys for Plaintiffs,*
*Susan Hess Herskovitz and Carl J. Roeder,*
*individually and on behalf of the Class and the*
*Corridor Subclass*